**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Mary Ann Whipple
United States Bankruptcy Judge

**Dated: November 28 2016**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 15-30316 |
| | ) | |
| Stone Oak Investment, LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | JUDGE MARY ANN WHIPPLE |

### ORDER DENYING MOTION FOR CRAMDOWN AND CONFIRMATION OF PLAN

The court held an evidentiary hearing on Debtor's motion for cramdown and for confirmation of its proposed Amended Chapter 11 Plan. [Doc. # 120]. Debtor's principal Bonnie Ostrander, counsel for Debtor, and attorneys for Pigott Ltd., Farmer & Merchants State Bank, the Lucas County Treasurer, and the United States Trustee all appeared in person.

The district court has jurisdiction over this Chapter 11 case pursuant to 28 U.S.C. § 1334(a) as a case under Title 11. It has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 2012-7 of the United States District Court for the Northern District of Ohio. Proceedings involving confirmation of a proposed plan are core proceedings that the court may hear and determine under 28 U.S.C. § 157(b)(1) and (b)(2)(L). For the reasons that follow, Debtor's motion for cramdown and for confirmation of its Amended Chapter 11 Plan [Doc. # 114-1] will be denied.

### BACKGROUND

Debtor is a limited liability company in which Bonnie Ostrander ("Ostrander") owns a 100 percent interest. Its only assets consist of a parcel of vacant land with a retention pond located at 9136 Angola

Road, Holland, Ohio ("Angola Road Property"), a fraudulent transfer claim valued at $32,000, and potential nuisance and trespass claims ("Litigation Claims") against the owner of property adjacent to the Angola Road Property as a result of certain drainage issues. The fraudulent transfer claim results from Debtor's sale of a second parcel of real estate during the months leading up to the filing of its Chapter 11 bankruptcy petition, the net proceeds of which Ostrander testified were transferred for use in setting up the operations of another business, Stone Oak Market, Inc., discussed below,

Ostrander and her former husband were owners of Stone Oak Market, Inc., which operated a convenience store located on property previously owned by it that is adjacent to the Angola Road Property.[1] The Stone Oak Market, Inc. business and the property on which the store was located were eventually sold in a state court receivership proceeding. The only asset that remained with Stone Oak Market, Inc. after the sale was a liquor permit. Thereafter, the liquor permit was not used for five years; however, Ostrander continued to pay the permit renewal fees.

Debtor has leased property from Michael Hartsell ("Hartsell") located on Old Airport Highway, Monclova, Ohio ("Monclova Property"). According to Ostrander, because the liquor permit is in the name of Stone Oak Market, Inc., Debtor has subleased the property to Stone Oak Market, Inc., which then began operating a convenience store in May 2015, doing business as Stone Oak Marketplace. Both Ostrander's home and the convenience store are located on the Monclova Property. She testified that the lease payment owed by Debtor to Hartsell is $4,200 per month. However, Ostrander testified that she incurred certain unspecified costs for repairs to the building before opening the store and that Hartsell told her "to take the first year" and apply those costs as rent. She later testified that Debtor has an agreement with Hartsell that lease payments need only be made "upon purchase of the property" when financing is available. Ostrander testified that Debtor therefore requires and receives no lease payments from Stone Oak Market, Inc., and it requires Stone Oak Market, Inc., to pay only the property taxes, insurance and utilities for the Monclova Property. Although Debtor has a written lease agreement with Hartsell, which was in evidence in a prior proceeding on disclosure, the agreement is not in evidence.

Ostrander testified that she also owns Stone Oak Marketplace LLC ("the LLC"). There is no evidence that the LLC owns any assets at this time. Debtor's proposed Amended Chapter 11 Plan ("the Plan") provides that the LLC will be utilized as the Reorganized Debtor. [Doc. # 114-1, Art. I, ¶ 1.41]. According to the Second Amended Disclosure Statement ("Disclosure Statement"), the means of

---

[1] The record is unclear as to whether Ostrander now owns 100 percent interest in Stone Oak Market, Inc., or whether her ex-spouse also still owns an interest in the company.

implementing the Plan include transferring the Monclova Property lease and the $32,000 fraudulent transfer claim to the LLC. [Doc. # 114, ¶ IV(A)(2)]. In addition, the Disclosure Statement provides that Stone Oak Market, Inc. will transfer the liquor permit and the inventory and equipment associated with the operation of the current convenience store to the Reorganized Debtor. [*Id.*].

These transfer provisions are not included in the Plan. The Plan, however, states that the funds necessary for making payments to holders of the allowed classified claims described in Part IV of the Plan shall come from (i) "Net Operating Income; (ii) the Capital Contribution; (iii) Cash Flow Surplus;[2] (iv) Any Refinancing Proceeds; and (v) Net Disposition Proceeds." [Doc. # 114-1, Art. V, ¶ 5.1]. "Net Operating Income" is defined in the Plan as the "Net Operating Income of either the Debtor or the Reorganized Debtor." [*Id.* at Art. I, ¶ 1.34]. Debtor has no operations that produce income, nor does the LLC absent the transfer of assets from Stone Oak Market, Inc., in order to enable it to operate the convenience store. Thus, the Plan appears to at least contemplate the transfers from Stone Oak Market, Inc., referred to in the Disclosure Statement.

The Plan provides that, unless otherwise agreed to in writing, holders of allowed administrative expenses will receive cash in the allowed amount on the effective date of the Plan or, if allowed after the effective date, within thirty days after the date an order allowing the expense becomes a final order. [*Id.* at Art. III, ¶ 3.1]. The Plan also provides for payment on the effective date of statutory fees then owed to the United States Trustee and quarterly payments thereafter until the case is converted, dismissed or closed. At the time of the hearing on confirmation of the Plan, Debtor was current in payment of the United States Trustee fees, with the fees having been paid by Ostrander personally.

The Plan sets forth six classes of claims and interests. Class 1 is the allowed secured claim of the Lucas County Treasurer for property taxes for the Angola Road Property, the amount of which Debtor projects to be $25,900.97. [*Id.* at Art. IV, ¶ 4.1]. The Plan provides for monthly cash payments in accordance with 11 U.S.C. § 1129(a)(9). [*See id.* at ¶ 4.2]. Pursuant to an installment agreement with the Lucas County Treasurer, the payment required to satisfy this obligation as well as the ongoing property taxes for the Angola Road Property is $733 per month. Ostrander testified that she currently is making

---

[2] "Cash Flow Surplus" is defined as "the net income from the operations of the Reorganized Debtor that is not necessary for use by the Reorganized Debtor in its operations." [Doc. # 114-1, Art. I, ¶ 1.12]. It thus appears to simply be, at best, a subset of Net Operating Income and adds nothing additional to the source of funds for implementing the Plan.

3

this payment.[3]

Class 2 is the allowed secured claim of Pigott, Ltd, which, according to the Plan, Debtor projects to be equal to the principal amount of $48,218.77, plus interest to the date of filing. [*Id.* at ¶ 4.2]. Class 3 is the allowed secured claim of Farmers and Merchants State Bank ("the Bank") which, according to the Plan, Debtor estimates to be equal to the principal amount of $36,288 plus interest to date of confirmation at the note rate. [*Id.* at ¶ 4.3]. The Plan provides the same payment terms for both the Bank and Pigott, Ltd. Specifically, to the extent their claims are secured, the Plan provides that "between the Effective Date [of the Plan] and the seventh (7th) anniversary of the Effective Date" payments are to be made in monthly installments equal to the amount necessary to amortize each claim over thirty years, plus simple interest at the prevailing prime rate plus 1.5% per annum, with a balloon payment of the outstanding principal and interest "[o]n or before the sixth (6th) anniversary of the Effective Date." [*Id.* at ¶¶ 4.2.1 & 4.3.1]. The Plan further provides that if the claims are established as unsecured, then they shall be entitled to a pro rata share of (1) the sum of $32,000 and (2) any net proceeds from the Litigation Claim, as is provided for unsecured claims under Class 4. [*Id.* at ¶¶ 4.2.4 & 4.34]. The $32,000 represents the liquidation value of the fraudulent transfer claim held by Debtor and is the "Minimum Liquidation Value," as defined in the Plan. [*See id.*].

Notwithstanding the proposed treatment of the Bank's claim set forth in the Plan, Ostrander testified that she is a guarantor of the note owed to the Bank and that she entered into a forbearance agreement with the Bank, pursuant to which the monthly obligation with respect to the Bank's claim is $307 until paid in full, whether it is deemed secured or unsecured. The Plan, however, provides that on confirmation of the Plan, "[n]either the Reorganized Debtor nor its representatives and owners shall have any liability to any holders of Claims other than to make the distributions expressly provided for under the Plan." [*Id.* at Art. VI, ¶ 6.1].

Under the Plan, holders of Class 4 unsecured claims would receive their pro rata share of $533.00 per month beginning on the first business day of the first full calendar month following the effective date of the Plan until the $32,000 Minimum Liquidation Value is paid in full. [*Id.* at ¶ 4.4.1]. In addition, they

---

[3] Documentation filed post-hearing by the Lucas County, Ohio Prosecutor's Office on behalf of the Lucas County Treasurer's Office, and of which the court takes judicial notice, Fed. R. Bankr. P. 9017; Fed. R. Evid. 201(b)(2); *In re Calder*, 907 F.2d 953, 955 n.2 (10th Cir. 1990); *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1171-72 (6th Cir. 1979) (stating that judicial notice is particularly applicable to the court's own records of litigation closely related to the case before it), shows that the last payments made pursuant to the Debtor Installment Payment Plan were made on July 29, 2016. [Doc. # 126, October 31, 2016]. As a result, the installment agreement is considered in default and the Lucas County Treasurer's claim reverts to $26,190.40, plus interest at 12%.

4

would receive their "pro rata share of any proceeds received on account of the Litigation Claims," which have not been filed in any court, within thirty days of receipt by Debtor or the Reorganized Debtor. [*Id.*]. To the extent that the claims of Pigott, Ltd. and the Bank are unsecured, they are the only unsecured creditors identified by Debtor.

Although the Plan projects Pigott, Ltd. and the Bank's claims to be fully secured by the value of the Angola Road Property, Ostrander testified that it is more likely that they are both unsecured. She testified that she has requested a reassessment of the Lucas County Auditor's valuation of the property and that she estimates the actual value to be between $20,000 and $25,000. If true, only the Lucas County Treasurer's claim would be secured pursuant to its first priority statutory lien. However, the Auditor's reassessment has not been completed and Ostrander has offered no reasoned basis for her estimated value rather than the $115,000 value that she attributes to the property on bankruptcy Schedule A except that the auditor told her that "the value was extremely reduced."

Holders of executory contracts comprise Class 5 and are not impaired. [*Id.* at ¶ 5.0]. Class 6 is comprised of membership interests and provides that "[e]ach member shall retain its interest in the Debtor, as applicable, as a result of the treatment of Class 1 - and the new value added by virtue of the Member's Capital Contribution under the Plan." [*Id.* at ¶ 6.0]. "Capital Contribution" is defined in the Plan as follows:

> the new post-Confirmation capital contribution to the Debtor's Estate by the Member of the Debtor or the Reorganized Debtor in the amounts necessary to fund: (i) payment on the Effective Date of all Allowed Class 2, Allowed Class 3 and Class 4 Claims whose holders elect the Alternative Unsecured Claim Treatment; (ii) payment on the Effective Date of all Allowed Administrative Claims, including U.S. Trustee's fees and professional fees owing as of the Effective Date of the Plan; and (iii) payment of any Administrative Claim that becomes an Allowed Claim after the Effective Date, within thirty (30) days of becoming an Allowed Claim.

[*Id.* at Art. I, ¶ 1.11]. "Alternative Unsecured Claim Treatment" is not a term defined in the Plan.

The Plan provides for the payment of Periodic Distributions, defined as the required monthly or quarterly distributions, from the following sources: "(a) first, from Net Operating Income; (b) second, as necessary, from the Cash Flow Surplus of the Reorganized Debtor; and (c) third, as necessary and applicable, from Capital Contributions. [*Id.* at Art. V, ¶ 5.3 & Art. I, ¶ 1.35]. It provides for the payment of allowed administrative claims and the United States Trustee's fees from Net Operating Income and Capital Contributions. [*Id.* at Art. V, ¶ 5.2]. It further provides that "Net Refinancing Proceeds," a term not otherwise defined, or "Net Disposition Proceeds," defined as "any net proceeds obtained from the sale, liquidation or disposition of any assets of the Debtor," will be used to fund the Final Distribution on account

5

of Allowed Claims. [*Id.* at Art. V, ¶ 5.4 & Art. I, ¶ 1.33]. "Final Distribution" means "any final distribution required to be made on account of Allowed Claims in Classes 1, 2, 3, 4, and 5, not including any Periodic Distributions," [*Id.* at Art. I, ¶1.27], and would include the ballon payment due on the Pigott, Ltd.'s and Bank's claims if secured.

Although Debtor has no means to make the monthly payments that would be required under the Plan, it offered profit and loss statements and balance sheets of Stone Oak Market, Inc. dba Stone Oak Marketplace as evidence of the Reorganized Debtor's ability to make the required payments. Ostrander testified that because she works 120 hours per week at the convenience store, her mother assisted her in preparing the financial statements. The financial statements span the time period between May 2015, when the company began operating the new convenience store, and July 31, 2016. [Debtor Exs. 1-4]. The profit and loss statements for May 2015 through December 2015, which include no property tax expense, shows that the average net monthly income from operation of the convenience store was $1,420.22. [*See* Debtor Ex. 1]. The profit and loss statements for January 2016 through July 2016 show that the average net income from operations was $1,706.19. [*See* Debtor Ex. 3]. As discussed above, Stone Oak Market, Inc. is not paying, and thus the profit and loss statements do not include, any lease expense for the Monclova Property. The profit and loss statements also do not include a payroll expense. Ostrander testified that there are no employees other than herself.

The May 31, 2015, Stone Oak Market, Inc. balance sheet shows liabilities that include notes payable owed to George Wynn and Melissa Koch in the amounts of $15,000 and $8,000, respectively. [Debtor Ex. 2]. The notes are not in evidence and the record is silent as to the repayment terms. Although the profit and loss statements do not show any expense for debt payments, the balance sheets show that between February and April of 2016, the debt owed to George Wynn was decreased by a total of $1,250. [Debtor Ex. 4].

The balance sheets also include a note(s) payable to "Shareholder," which apparently refers to Ostrander. According to Ostrander, she puts money into the business when needed and takes it out when the business is able to repay her. Notwithstanding the notes payable designation in the balance sheets, she testified that she does not consider her infusion of cash to be a loan, that she has no records of such but rather has only a rough idea of the amounts she has put into and taken out of the business. Nevertheless, the balance sheets show her initial infusion of cash in the amount of $9,018 in May 2015 and an additional $9,215 in June of 2015. [Debtor Ex. 2]. Thereafter, the balance sheets show the total amount "owed" to Ostrander fluctuates up and down by a few thousand dollars each month until February 2016 when she put another $17,305 into the business, for a total balance of $37,849.93 owed to her at that time. [*See* Debtor

Ex. 4]. Between February and July 31, 2016, that balance was reduced to $23,985.22. [*Id.*].

Ostrander testified that she is aware of default judgments that were entered in favor of WR Steel Co. and against Stone Oak Market, Inc. in the amount of $3,125 and that the Stone Oak Market, Inc. has also been sued by Gordon Food Service for an alleged debt in the amount of $1,592. However, neither are included on the balance sheets. She further testified that she is aware of a default judgment entered against Stone Oak Marketplace, LLC in the amount of $627.93.

Ostrander's personal income consists of her pension after retiring from the Toledo Public Schools in the net monthly amount of $2,500. Her mother lives with her and contributes approximately $300 per month towards their utility expenses. Ostrander testified that she has no mortgage or rent expense since her home is located with the business on the Angola Road Property. While there is no further evidence regarding her financial condition, she testified that her income is sufficient for her to live on without the business income. She also testified that her income is sufficient for her to make the monthly Plan payments of $733 for property taxes and $533 to unsecured creditors to the extent that either Pigott, Ltd. or the Bank are unsecured.

After transmitting the approved disclosure statement and Plan to creditors and interest holders, on July 29, 2016, Debtor filed a Declaration and Certification of Ballots showing that no ballots were received by Classes 1 and 5, Class 2, which addresses the claim of Pigott, Ltd., rejected the Plan, and Classes 3 and 4, which address the Bank's claim and unsecured claims, accepted the Plan. All classes are impaired under the terms of the Plan. No objections to confirmation of the Plan were filed.

## LAW AND ANALYSIS

Congress set forth requirements for confirmation of a Chapter 11 plan in 11 U.S.C. § 1129(a)(1) through (16). The plan proponent must demonstrate that the plan meets each applicable requirement, with the exception of § 1129(a)(8). That section sets forth a requirement that each class of claims or interests have either accepted the plan or are not impaired under the plan. 11 U.S.C. § 1129(a)(8). Notwithstanding that requirement, a plan may still be confirmed on request of the proponent of the plan "if all of the applicable requirements of [§ 1129(a)] other than paragraph (8) are met with respect to [the] plan" and "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1).

In this case, all classes of claims and interests are impaired and Class 2 has rejected Debtor's Plan, thus implicating the provisions of § 1129(b). Although no objection to confirmation was filed, "the Court has an independent duty to determine compliance with each of the Bankruptcy Code's confirmation

requirements." *In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 458 (Bankr. S.D. Ohio 2011); *In re Stigliano*, 483 B.R. 303, 305 (Bankr. W.D. Pa. 2012) (same); *Everett v. Perez (In re Perez)*, 30 F.3d 1209, 1213-14 (9th Cir. 1994) (stating that, notwithstanding no objection was filed, in seeking confirmation and representing that the plan complies with all applicable provisions of Title 11, a plan proponent placed such compliance squarely before the court and the court was required to satisfy itself that such was the case). Debtor, as plan proponent, has the burden of proving, by a preponderance of the evidence, that the Plan complies with all of the statutory requirements for confirmation found in § 1129. *United States v. Arnold and Baker Farms (In re Arnold and Baker Farms)*, 177 B.R. 648, 654 (B.A.P. 9th Cir. 1994), *aff'd* 85 F.3d 1415 (9th Cir. 1996); *In re Trenton Ridge Inv'rs, LLC*, 461 B.R. at 459.

As Debtor and the parties in interest recognize, and as the issue upon which the evidence at the confirmation hearing focused, the feasibility of Debtor's Plan is the touchstone confirmation requirement in this case. A plan cannot be confirmed unless it is feasible, meaning under § 1129(a)(11) that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11); *In re Shefa, LLC,* 524 B.R. 717, 741 (Bankr. E.D. Mich. 2015)(§ 1129(a)(11) is commonly referred to as the "feasibility" requirement for confirmation). A proponent of a Chapter 11 plan need not show that the plan's success is guaranteed. *In re Arts Dairy, LLC*, 432 B.R. 712, 717 (Bankr. N.D. Ohio 2010). Rather, "only a reasonable assurance of commercial viability is required to establish feasibility for purposes of § 1129(a)(11)." *Id.* (citing *In re Briscoe Enter., Ltd., II*, 994 F.2d 1160, 1166 (5th Cir. 1993)).

There is no question that Debtor itself has no ability to make the payments required under the terms of the Plan as it conducts no business and has no income. The feasibility of the Plan instead depends upon two components: the operations of the new convenience store currently ongoing under Stone Oak Market, Inc. and Ostrander's personal financial wherewithal.

The Plan contemplates that the monthly payments required will be made first by the LLC, as the Reorganized Debtor, from the Net Operating Income after Stone Oak Market, Inc.'s transfer of certain assets associated with the operation of its convenience store to the LLC. Notably, the disclosure statement states only that the inventory and equipment associated with operation of the convenience store will be transferred. Neither the disclosure statement nor the Plan provide for Stone Oak Market, Inc.'s transfer of any other asset. Specifically, they do not provide for the transfer of the Key Bank account, petty cash, or customer charges, valued at $5,209.62, $15,734.44, and $3,977.29, respectively, as of July 31, 2016. [*See* Debtor's

Ex. 4].

As of July 30, 2016, the total net operating income of Stone Oak Market, Inc. for 2016, after its opening in May 2015, was $11,943.36, of which $1,324.35 is attributed to check cashing fees. According to Ostrander, the purpose of the large amount of petty cash is for use in cashing checks. Although the profit and loss statements show losses in several months, the average monthly net operating income during the first seven months of 2016 was $1,706.19. Without use of the petty cash to produce income from the check cashing fees, the average monthly net operating income would have been no more than $1,517.00.

This income, however, does not reflect the $4,200 monthly lease expense. The court finds Ostrander's testimony regarding informal arrangements she has with Hartsell does not meet Debtor's burden of showing that sufficient income will be available to make the Plan payments. She testified that Hartsell has allowed Debtor "to take the first year" and apply certain unspecified repair costs towards rent and later testified that Debtor has an agreement with Hartsell that lease payments need only be made "upon purchase of the property" when financing is available. However, the court is not willing to find from just Ostrander's testimony that Hartsell will have no recourse against the Reorganized Debtor for failing to make lease payments during the five to seven year period[4] that Plan payments must be made. *See In re Bellows*, 554 B.R. 219, 226, 231 (Bankr. D. Alaska 2016)(debtor's assurances that his sister renounced her interest in various reorganization entities "provide little comfort, much less a basis to confirm a plan of reorganization"). To the extent that lease payments will be required during the course of the Plan, the evidence fails to show that the Reorganized Debtor will be able to make them, let alone the monthly payments that would be required by the Plan. In addition, the record is silent regarding the terms of the notes payable shown on the balance sheets of Stone Oak Market, Inc., and whether any payments to those creditors will be required during the course of the Plan.

Even if the Reorganized Debtor will not be required to make debt payments or lease payments during the course of the Plan, Stone Oak Market, Inc.'s balance sheets show that it still requires significant infusions of cash from Ostrander to keep going. She tellingly and candidly testified that "I look at myself as the business." Ostrander herself has just emerged from a Chapter 13 case, Case No. 14-30994 in this court. Ostrander's infusion of approximately $17,300 in February 2016 to support convenience store

---

[4] The length of the Plan is unclear. To the extent that Class 2 (Pigott, Ltd. claims) and Class 3 (the Bank claims) are unsecured, the Plan requires payments for approximately sixty months. To the extent that either or both are secured, the Plan confusingly provides that monthly payments will be made until the *seventh* anniversary date of the effective date of the Plan and that a balloon payment of the outstanding principal and interest will be on the *sixth* anniversary of the effective date. [Doc. # 114-1, Art. IV, ¶¶ 4.2.1 & 4.3.1].

9

operations, [Debtor Ex. 4, Columns 1 and 2, N/P Shareholder], coincides with court authorization in the Chapter 13 case to disburse $18,262.47 from the sale of real property in that case, [Case No. 14-30994, Doc. # 130], a one- off source of cash that cannot be repeated. As characterized by counsel for the United States Trustee at the confirmation hearing, the Plan proposed by Debtor, which itself has no ability to make Plan payments, is on "life support" requiring the income of Stone Oak Market, Inc., which itself is on "life support" requiring that it be subsidized by Hartsell not requiring lease payments and requiring the support of Ostrander both by infusing additional funds into the business and by her working 120 hours per week without pay. There is no evidence of Ostrander's ability to continue "loaning" money to the business to the extent it may be necessary. And while the court appreciates her determination, it questions her ability to continue working the extensive hours that would be required of her in order to avoid the additional expense that would be incurred for payroll if one or more employees were hired.

An additional issue that may arise from the use of Stone Oak Market, Inc., as the "life support" for Debtor's Plan is that it requires the transfer of certain of its assets to the LLC as the Reorganized Debtor, without the LLC assuming any of its liabilities. Ostrander acknowledged at the confirmation hearing that several companies have sued Stone Oak Market, Inc. and at least two have obtained a money judgment against the company. In addition, Stone Oak Market, Inc.'s balance sheets show notes payable to two individuals as well as sales tax payable. Thus, the transfer of Stone Oak Market, Inc.'s assets to the LLC could potentially be subject to avoidance as a constructively fraudulent transfer. *See* Ohio Rev. Code § 1336.04(A).

The Plan also provides that Capital Contributions from Ostrander, as the member of Debtor or the Reorganized Debtor, may be used to make the payments required by the Plan to holders of classified claims. Ostrander testified that she receives a monthly pension in the net amount of $2,500 and receives $300 per month from her mother, who lives with her and assists in paying utility bills, and that she has no mortgage or lease expense. However, the record is otherwise silent regarding Ostrander's financial condition in the wake of a Chapter 7 case and a recently completed Chapter 13 individual reorganization. Even apart from the Lucas County Treasurer's filing of the notice of default in the installment payment plan, the court finds Ostrander's testimony that she can personally make the $733 monthly property tax payment and the $533 monthly payment that would be required to be paid to unsecured creditors to the extent that either Pigott, Ltd. or the Bank are unsecured is unpersuasive without further evidence regarding her personal expenses.

Furthermore, the Plan defines "Capital Contributions" to mean capital contributions in amounts necessary to fund payments of very specific claims. With respect to classified claims, the Plan limits the

10

definition of "Capital Contributions" to mean contributions in amounts necessary to fund payment "*on the Effective Date* of all Allowed Class 2, Class 3 and Class 4 Claims whose holders elect the Alternative Unsecured Claim Treatment. . . ." [Doc. # 114-1, Art. I, ¶ 1.11(i) (emphasis added)]. Article IV of the Plan, "Treatment of Classified Claims and Interests," does not under any circumstances provide for payment of Class 2, Class 3 and Class 4 claims on the effective date of the Plan and does not provide the holders of those claims to make any "election" regarding treatment of their claim. In addition, "Capital Contributions" is not defined to include the $733 monthly payment of Class I claims for property taxes owed. Thus, even if Ostrander has the ability to make the required monthly payments to holders of classified claims over the life of the Plan, the Plan itself does not appear to require her to do so.

The Plan also defines "Capital Contributions" to include allowed administrative expenses to be paid on the effective date of the plan or within thirty days of becoming an allowed claim. The record is silent as to the amount of any administrative expenses. In any event, the Plan provides that payment of administrative expenses will be made from Net Operating Income and Capital Contributions. However, for the reasons discussed above, Debtor has not shown that funds will actually be available to make these required Plan payments.

On the record before it, even assuming that the Plan meets the other relevant provisions of § 1129(a), the court cannot find that confirmation of the proposed Plan is not likely to be followed by the liquidation or further reorganization of Debtor or the Reorganized Debtor. The court concludes that Debtor has not shown that the Plan is feasible as required under § 1129(a)(11).

**THEREFORE,** because Debtor has not met its burden of demonstrating that the requirements for confirmation have been met, for all of the foregoing reasons, good cause appearing,

**IT IS ORDERED** that Debtor's Motion for Cramdown and Approval of Plan [Doc. # 120] and confirmation of Debtor's Amended Chapter 11 Plan [Doc. # 114-1] be, and hereby are, **DENIED.**

### 

11